UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NJERA A. WILSON,

                              Petitioner,

        -vs-                              **DECISION AND ORDER**
                                          **No. 6:14-cv-06135-MAT**

T. LAVALLEY, Superintendent Clinton
Correctional Facility, ERIC T.
SCHNEIDERMAN, Att. General of the State
of New York,

                              Respondents.
_____

## I.    Introduction

        Proceeding pro se, Njera A. Wilson ("Petitioner") has filed a

petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254

challenging his November 23, 2010 conviction following a jury trial

in Erie County Court (D'Amico, J.) of New York State on one count

of Burglary in the Second Degree (N.Y. Penal Law ("P.L.") §

140.25(2).

## II.   Factual Background and Procedural History

        On February 26, 2010, Petitioner and co-defendant Deyon T.

Roberts ("Roberts") were charged in a two-count indictment with

Burglary in the First Degree (P.L. § 140.30(3)) and Burglary in the

Second Degree (P.L. § 140.25(2)). The charges stemmed from

allegations that on the night of September 10, 2009, Petitioner and

Roberts knowingly and unlawfully entered the dwelling of Jessie

Lewis ("Lewis"), with the intent to commit a crime, and while

-1-

inside the dwelling, one of them threatened the immediate use of a dangerous instrument (a crow bar).

Beginning on August 24, 2010, Petitioner and Roberts were tried jointly before Erie County Court Judge Michael D'Amico and a jury. Lewis testified that on September 10, 2009, he was residing at an apartment complex at 608 Niagara Street in the City of Buffalo. Sometime in the morning, Lewis took his 8-week-old puppy to a nearby park for a walk, locking his apartment when he left. Upon returning home about 45 minutes later, he entered the vestibule and noticed someone coming out of his apartment holding a crowbar and a duffel bag. This man, whom Lewis later identified as Petitioner, seemed startled. Lewis then saw Roberts inside the apartment holding a pistol, which he aimed in Lewis' direction.

Lewis turned and ran down the street and, in his haste, left his dog behind. Using his cell phone, Lewis called 911. While on the phone with 911, Lewis saw Roberts run toward the backyard of 608 Niagara Street. When the police arrived, Lewis spoke with them and provided a description of Petitioner and Roberts.

One of the responding officers, Keith Devlin ("Devlin") checked the backyard of Lewis' apartment complex since Lewis had seen Roberts run in that direction. From an adjoining vacant lot, Devlin heard a rustling sound coming from the vicinity of a couple abandoned vehicles and some tall weeds. As he walked toward that area, Roberts jumped up in front of him. Roberts was sweaty,

covered in burrs and vegetation, and breathing heavily. Devlin arrested Roberts.

Another responding officer, Donna Donovan ("Donovan"), was speaking to some potential witnesses near Lewis' apartment when she observed Petitioner walking down a driveway located two houses down, at 551 7th Street.[1] Petitioner was sweaty and covered in leaves. Donovan stopped him and asked him some questions. Because his answers did not make sense to her, Donovan placed Petitioner in the back of her patrol car and returned to the driveway down which she had seen Petitioner walking. Next to some garbage cans, she saw a duffle bag which appeared to be moving. Donovan opened up the bag and discovered Petitioner's puppy and a bulletproof vest.

Donovan brought Petitioner back to 608 Niagara Street, where he was identified by Lewis in a show-up identification procedure. At that time, Lewis also identified Roberts. While Petitioner was still in the back of Donovan's patrol car, Lewis heard him shout to his (Lewis') step-sister, "Monique, it wasn't me, I didn't have a gun!" T.448.[2]

Several items found at Lewis' apartment—a pair of leather gloves, a black pry bar, and a screwdriver—were collected by the police. These items, along with a watch and a gun found in a nearby

---

[1]     The lot at 551 7th Street shared a backyard with 608 Niagara Street.

[2]     References to "T." are to pages from the transcript of Petitioner's trial.

basement window-well, were submitted for DNA testing. The test results indicated that the pry bar contained a mixture of DNA, and Petitioner could not be excluded as a source of one of the DNA profiles found on the pry bar. The forensic chemist who tested the samples testified that the odds of randomly selecting an unrelated individual from the United States population as a possible contributor was 1 in 1,070 individuals. The DNA profile on the right-hand leather glove matched Roberts' DNA. Roberts also could not be excluded as a contributor to the DNA found on the watch. The odds of randomly selecting an unrelated individual as a possible contributor was 1 in 22.9 million individuals.

Roberts testified that on the morning of September 10, 2009, he went to a local park to work out, after which he went to the Niagara Café for lunch. After trying to visit a friend, who was not home, he cut through a vacant lot to get to a gas station to buy some bottled water. A police officer appeared, forced him to the ground at gunpoint, and handcuffed him. Roberts said that, as was his habit, he had been wearing leather gloves during his workout to protect his hands and wedding ring. He did not know what happened to the gloves after his altercation with the police. He testified that he never had been inside Lewis' apartment.

Petitioner did not testify. The defense theory was that Lewis misidentified Petitioner as a suspect, and that Petitioner simply was in the wrong place at the wrong time when he was arrested.

On August 30, 2010, the jury returned a verdict acquitting Petitioner of the first degree burglary count but convicting him of the second degree burglary count.

On November 23, 2010, Petitioner was adjudicated as a second violent felony offender and was sentenced to a determinate term of 7 years on the second degree burglary conviction, to be followed by 5 years of post-release supervision.

On direct appeal, appellate counsel filed a brief, and Petitioner filed a pro se supplemental brief. The Appellate Division, Fourth Department, of New York State Supreme Court, unanimously affirmed the conviction. Leave to appeal and reconsideration were denied by the New York Court of Appeals. People v. Wilson, 104 A.D.3d 1231 (4th Dep't), lv. denied, 21 N.Y.3d 1011, reconsideration denied, 21 N.Y.3d 1078 (2013).

This timely habeas petition followed, in which Petitioner asserts the claims he raised in his pro se appellate brief. Respondent answered the petition and filed an opposition memorandum of law. Petitioner filed a reply. For the reasons discussed below, Petitioner's request for a writ of habeas corpus is denied.

## III. Merits of the Petition

### A.   Prosecutorial Misconduct

Petitioner asserts, as he did on direct appeal in his pro se supplemental brief, that the prosecutor committed misconduct during closing argument. The Appellate Division found that "the

-5-

prosecutor's comments during summation were 'either a fair response to defense counsel's summation or fair comment on the evidence[.]'" People v. Wilson, 104 A.D.3d at 1233 (quotation omitted); internal quotation marks omitted in original).

A claim of prosecutorial misconduct on habeas corpus is reviewed under "the narrow [standard] of due process, and not the broad exercise of supervisory power." Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir. 1990) (citation omitted). The relevant question is whether "the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair." Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986). Generally, inappropriate prosecutorial comments, standing alone, are insufficient to reverse a conviction. United States v. Young, 470 U.S. 1, 11 (1985). Rather, the reviewing court must assess the impact of the improprieties on the fairness of the trial as a whole. Id.; see also Smith v. Phillips, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

Petitioner faults the prosecutor for vouching for the credibility of the State's witnesses during his summation. See Petitioner's Supplemental Appellate Brief ("Pet'r Supp. Br.") at 13 (citations to record omitted). Although it is generally improper for the government to vouch for the credibility of its own

-6-

witnesses, the Second Circuit has noted that a prosecutor may respond to a defense summation that "invited this response." Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991). In Gonzalez, the petitioner asserted that the prosecutor committed misconduct by arguing that a key prosecution witness "had no reason to lie." The Second Circuit did not find the remark improper since "the defense's summation invited this response by arguing that [the witness] had testified only to impress the other key prosecution witness." Id. In that context, where the defense urged a theory of fabrication by prosecution witnesses, the Second Circuit held that the "prosecutor's response [was] unlikely to have affected the jury's ability to judge the evidence fairly." Id. (citing Young, 470 U.S. at 12-13); other citations omitted). Here, similarly to Gonzalez, the prosecutor asked rhetorically, "Why would [Lewis, the complainant] lie?" T.717. Given that defense counsel's summation, fairly interpreted, could be read as inviting such a response,[3] the Court cannot find that the prosecutor committed misconduct. See Gonzalez, 934 F.2d at 424; see also Morales v. Walsh, No. CV-05-2251(DGT), 2008 WL 2047632, at *7 (E.D.N.Y. May 12, 2008) ("Given that much of the defenses' summations were devoted to discrediting [the complainant] and his version of events, it was appropriate for the prosecutor to make arguments regarding the

---

[3] Defense counsel asserted, e.g., "Jessie [Lewis] couldn't tell you the truth which doesn't change because he is capable of just lie, after lie, after lie." T.692.

credibility of her own witness.") (citing <u>Natal v. Bennett</u>, 98 Civ.
1872(RWS), 1998 WL 841480, at *8 (S.D.N.Y. Dec. 3, 1998) (finding
no prosecutorial misconduct where "[m]uch of the objectionable
content was invited by or was in response to the opening summation
of the defense"); other citation and citations to record omitted)).

With regard to the prosecutor's comments to the effect that
Lewis consistently had identified Roberts and Petitioner as the two
men he saw in his apartment building, T.717, 724, 725, the Court
agrees with the Appellate Division that they were fair comment on
the evidence and thus not improper. However, the prosecutor's
comment about Petitioner's certainty of his identifications,
T.725:4-5 ("He's 100 percent sure then and now."), could be
construed as improper vouching. <u>See</u> <u>Gonzalez</u>, 934 F.2d at 424
(holding that prosecutor's statement, "He did not lie. I will
submit he did not lie," constituted a "personal voucher" of the
witness' truthfulness and, "of course, was improper"). Here,
however, the prosecutor was repeating, verbatim, testimony that
Lewis had given. It would have been better practice for the
prosecutor to specifically indicate that he was quoting Lewis, so
as to avoid any implication that he was putting the weight of his
official position behind Lewis' veracity. Given that it was a
single remark in the context of an otherwise unremarkable trial,
and given that neither defense attorney objected, the Court cannot
find that this was misconduct warranting reversal even under a

<u>de</u> <u>novo</u> standard.

With regard to the prosecutor's comment, "I take Jessie Lewis at his word," T.728, that was made specifically in response to the defense argument that the gun recovered from a basement window-well near Lewis' apartment actually belonged to Lewis. The prosecutor went on to explain that he did not have the gun tested because he believed Lewis' statement that it was not his, and the prosecutor emphasized that the gun was irrelevant to his case. Taken in context, the Court does not find that the remark amounted to misconduct.

In sum, most of the comments challenged by Petitioner were not objectionable at all, and the comments that arguably were improper were not part of a persistent pattern of misconduct. Significantly, the jury acquitted Petitioner of the top count of the indictment, which "reinforces [the] conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly." <u>Young</u>, 470 U.S. at 18 n. 15. For these reasons, the Court finds that the complained-of comments did not render Petitioner's trial "so fundamentally unfair as to deny him due process[,]" <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 645 (1974). Therefore, Petitioner's claim of prosecutorial misconduct does not warrant habeas relief.

### B.   Erroneous Jury Instructions

Petitioner re-asserts his claims, raised on direct appeal in

his pro se supplemental brief, that the trial court issued several prejudicially erroneous jury instructions. The Appellate Division found that all of the challenged instructions "were proper[.]" People v. Wilson, 104 A.D.3d at 1233 (citations omitted).

When a habeas court examines a claim that a jury charge is erroneous, it must "review the jury instructions as a whole[,]" Smalls, 191 F.3d at 277, without judging the challenged portion of instruction "in artificial isolation[.]" Chalmers v. Mitchell, 73 F.3d 1262, 1267 (2d Cir. 1996) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The petitioner must establish "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to [him] by the Fourteenth Amendment." Cupp, 414 U.S. at 146.

### 1.   Failure to Testify

Petitioner argues that the trial court failed to instruct the jury that his failure to testify was not a tactical maneuver but an exercise of his constitutional rights. See Pet'r Supp. Br. at 17 (citing People v. Reid,  135 A.D.2d 753, 754 (2d Dep't 1987)). First, the sole authority on which Petitioner relies is a State law case; Petitioner has cited no Federal authority standing for the proposition that a trial court affirmatively must instruct the jury that a defendant's decision not to testify was not a "tactical maneuver." Second, the case on which Petitioner relies is inapposite. In Reid, supra, the trial judge gave an instruction

that affirmatively "drew the jury's attention to the defendant's silence and implied that his decision not to testify was a tactical maneuver rather than the exercise of a constitutional right[.]" 135 A.D.2d at 754 (citation omitted). The trial court in Petitioner's case did not give an instruction similar to the one criticized by the appellate court in Reid, but instead properly informed the jury that "the fact that [Petitioner did not testify is not a factor from which any inference unfavorable to him may be drawn." T.756. There was no error of State law in this charge, much less an error of Federal constitutional magnitude.

### 2. Interested Witness

Petitioner asserts that the trial court's interested witness charge was not balanced because the trial court did not point out that if Petitioner's version of events was correct, the principal prosecution witness would be subject to "criminal liability" and, in this respect, was "interested" in the trial's outcome as well. See Pet'r Supp. Br. at 18 (citations omitted). For this argument, Petitioner relies solely on caselaw from intermediate appellate courts in New York and has not alerted the Court to any pertinent Federal caselaw.

It appears that as a matter of New York law, courts frequently will accompany a charge that the defendant is an interested witness with a charge "indicat[ing] that the prosecution's witness may be interested." People v. Suarez, 125 A.D.2d 350, 350 (2d Dep't 1986).

-11-

However, the failure to do so is not per se error necessitating reversal, even as a matter of New York State law. See id. at 350-51 (stating that "the determination of whether a witness is interested in the outcome of a case is ordinarily a question of fact for the jury's determination[,]" and "[a]ccordingly, the court did not err in refusing to grant the defendant's request to charge that the prosecution's police witnesses are interested as a matter of law") (internal and other citations omitted). Again, Petitioner has not demonstrated an error of State law, much less an error of Federal constitutional magnitude.

### 3.  **Allen** Charge

When notified that a jury has reached an impasse during its deliberations, the trial judge may give a charge, commonly referred to as an Allen charge,[4] that urges the jurors to continue deliberating in order to reach a verdict. Smalls, 191 F.3d at 278 (citation omitted). Petitioner argues that the trial court's Allen charge coerced the jury into reaching a guilty verdict.

The propriety of an Allen charge in a given case depends on whether it tends to coerce undecided jurors into reaching a verdict, such as by "encourag[ing] [them] to abandon, without any principled reason," "doubts . . . conscientiously" held as to a

---

[4]
    "The term 'Allen charge' is a generic term used for a type of supplemental instruction that is given to a deadlocked jury, first approved by the Supreme Court in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)." Smalls v. Batista, 191 F.3d 272, 275 n.1 (2d Cir. 1999).

defendant's guilt. <u>United States v. Melendez</u>, 60 F.3d 41, 51 (2d Cir. 1995) (quoted in <u>Smalls</u>, 191 F.3d at 278-79). Jury deliberations constitute a "critical stage of a criminal trial," <u>United States v. Ruggiero</u>, 928 F.2d 1289, 1299 (2d Cir. 1991), and "[a]ny criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 241 (1988).

Petitioner objects to the following portion of the <u>Allen</u> charge:

> Now, let me impress upon you a couple of things. First of all, all of these parties chose you and selected you as jurors in this matter because they believe that you will follow your oath and do your best to determine the facts in this case. That's rather significant that they picked you.

T.776:21-777:1. However, it was not improper for the trial court to "remind[ ] the jurors about the importance of obtaining a verdict[,]" <u>Smalls</u>, 191 F.3d at 275 n.1 (citation omitted); indeed, this is part of a "traditional <u>Allen</u> charge." <u>Id.</u> (citation omitted). The Court cannot find that the challenged portion of the trial judge's <u>Allen</u> charge was erroneous, much less that it resulted in an infringement of Petitioner's due process right to an uncoerced jury verdict.

## C.   Ineffective Assistance of Trial Counsel

Petitioner asserts that trial counsel erred in failing to object to the above-discussed jury charges and prosecutorial remarks. The Appellate Division rejected this claim as without

merit.

In order to establish a claim of ineffective assistance of counsel, a defendant must show that his counsel provided deficient representation when compared to prevailing professional norms of practice, and that counsel's errors caused his client to suffer prejudice. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Prejudice under Strickland requires the defendant to demonstrate a "reasonable probability" of a more favorable result. Id. A reviewing court may review the two prongs of the Strickland standard in either order, and there is no reason to consider both if a defendant makes an inadequate showing on one. See id. at 697.

As discussed above, the Court has found that the alleged errors committed by the trial judge in the challenged jury instructions were not errors at all. Therefore, trial counsel's performance cannot be deemed deficient on this basis. See Lewis v. Bennett, 328 F. Supp.2d 396, 410 (W.D.N.Y. 2004) (finding that trial counsel "cannot be found deficient for failing to raise . . . nonmeritorious arguments").

With regard to the unobjected-to instances of prosecutorial misconduct, the Court has found that the vast majority of the challenged comments did not constitute improper summation argument. Therefore, trial counsel cannot be found deficient for failing to object to those remarks. See Lewis, 328 F. Supp.2d at 410.

With regard to the comments that trod close to, or over, the

-14-

line of proper argument, the Court cannot find that trial counsel's failure to object supports Petitioner's claim that he was deprived his Sixth Amendment right to effective assistance. Because the Appellate Division reviewed the prosecutorial misconduct claim on the merits, despite the lack of preservation, Petitioner was not prejudiced by counsel's failure to object to the alleged errors during trial. See Willson v. Berbary, 421 F. Supp.2d 589, 601-02 (W.D.N.Y. 2006) ("Because the state court reviewed Willson's prosecutorial misconduct claim on the merits, despite their being unpreserved for review, he was not prejudiced by trial counsel's failure to object to the comments at the time. Furthermore, as discussed above, both the state court and this Court found that the comments were not so prejudicial as to have denied Willson a fair trial."); Walker v. Bennett, 262 F. Supp.2d 25, 40 (W.D.N.Y. 2003) (finding that petitioner was unable to establish prejudice based on counsel's failure to object to prosecutor's remarks; even if counsel had objected, petitioner's challenge "would have proven fruitless on appeal" since appellate court reviewed prosecutorial misconduct claim and found that summation constituted fair response to defense remarks) (citing Flores v. Keane, 211 F. Supp.2d 426, 435 (S.D.N.Y. 2001)).

## IV.  Conclusion

For the foregoing reasons, Petitioner's request for a writ of habeas corpus is denied, and the petition is dismissed. The Court

declines to issue a certificate of appealability because Petitioner has failed to make a substantial showing of the denial of a constitutional right. <u>See</u> 28 U.S.C. § 2253(c)(2). Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action.

     **SO ORDERED**.

                                      S/ Michael A. Telesca

                                    ————————————————————
                                    HONORABLE MICHAEL A. TELESCA
                                    United States District Judge

DATED:     Rochester, New York
             April 24, 2015